Marian F. Harrison
US Bankruptcy Judge

Dated: 03/15/11

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## AT NASHVILLE

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| **MARK HUDSON, AND** | ) | **Case No. 208-09480** |
| **RACHEL SCARLETT HUDSON,** | ) | **Chapter 12** |
| | ) | **Judge Marian F. Harrison** |
| **Debtors.** | ) | |

_____

## MEMORANDUM OPINION
_____

This matter came before the Court upon the debtors' motion to utilize funds, the debtors' motion to incur credit, and Wells Fargo Financial Leasing, Inc.'s (hereinafter "Wells Fargo") objection to confirmation of the debtors' amended plan. The Court finds that the debtors' amended plan should be confirmed and that the motions to utilize funds and incur credit should be granted. The following represents the Court's findings of fact and conclusions of law, pursuant to Fed. R. Civ. P. 52(a)(1) as incorporated by Fed. R. Bankr. P. 7052, and made applicable by Fed. R. Bankr. P. 9014(c).

## I. FACTUAL BACKGROUND

The debtors operate a poultry farm located in Red Boiling Springs, Tennessee. The operation started in June 2004 with the construction of four Cagel-Keystone broiler houses

on 40 acres of the debtors' 137-acre farm.  Prior to the construction of the broiler houses, Wells Fargo had a first deed of trust on the debtors' 137 acres, including their house, in the amount of $250,000.

The addition of the broiler houses, including the equipment located inside, cost $749,259.74.  Wells Fargo financed the construction of the broiler houses and assumed the outstanding home and farm loans for a total of $980,000.  The project was finalized with the execution of a document entitled "Building Lease," dated June 29, 2004.  The Building Lease provided for payments of $15,631, which were due August, November, February, and April of each succeeding year for a period of 15 years.  These payment dates coincided with the maturity and sale of flocks.

The debtors presented the testimony and report of David M. Mainord, an appraiser located in Cookeville, Tennessee, who appraises farm properties in the area.  He testified, as in his report, that the chicken farm's market value is $700,000.  Wells Fargo presented the testimony and report of Lee E. Stringfellow, from Farmington, Arkansas.  He valued the collateral at $945,000.

At the first confirmation hearing, Mr. Hudson testified that Equity Group Kentucky (hereinafter "Equity Group"), who supplied chickens to the debtors, had agreed to reinstate their contract.  Thereafter, in May 2010, a Wells Fargo representative contacted Equity

Group regarding its contract with the debtors. Subsequently, Equity Group added the condition that a litter shed be constructed before the debtors would receive any flocks after the first flock. The litter shed will cost $27,500 to build, and without the litter shed, the debtors will not be able to continue as chicken farmers.

In order to build this litter shed, the debtors are able to secure financing, assuming the amended plan is confirmed, through Citizens Bank of Hartsville (hereinafter "Citizens Bank") in the amount of $27,500. As a condition of the loan, Citizens Bank requires a first lien on the farm to secure the indebtedness. The note is renewable up to 30 years.

Mr. Hudson testified that he will repay the litter shed loan through the money saved from installation of a water purification system that uses creek water in an amount up to 50% of total water consumption. This will result in an estimated savings of $1,250 per flock in the winter time and $2,250 per flock during the summer time.

Mr. Hudson explained that a flash flood in 2007 destroyed his water purification system, which he utilized for only two flocks. The flood re-routed the creek to an unuseable location. In May 2010, a second flood re-routed the creek to its original location. This new location gives the debtors the opportunity to reinstall a water purification system.

3 - U.S. Bankruptcy Court, M.D. Tenn.

The debtors' amended plan provides for Wells Fargo to be paid monthly payments from the debtors' employment as a Tennessee Department of Soil and Water Conservation employee and a Macon County school teacher, respectively, in the amount of $1,022.30 for 30 years toward a principal indebtedness on the house and farm of $190,340 with 5% interest per annum. As to the poultry facility, the amended plan provides for payments from each flock, averaging five flocks per year, for the next 20 years in the amount of $8,086.13 towards a principal amount of $509,660 with 5% interest per year.

At the end of 12 years, the principal indebtedness due Wells Fargo on the poultry operation will be $265,506.03, and at the end of 15 years, the principal will be $178,082.68. The indebtedness on the house and farm will be $145,338.86 in 12 years and $129,209.26 in 15 years. At some point between 12 and 15 years, the debtors anticipate that the chicken houses will need to be updated, which is normal in the poultry farming industry. The debtors predict that the cost of upgrades to their poultry operation will be approximately $150,000. One of the debtors' experts, Mike Long, testified at his deposition that generally, he would estimate that upgrades to 15 to 20-year-old poultry houses would cost around $200,000. However, Mr. Long never visited the debtors' farm and had no opinion as to the current condition of the debtors' poultry houses.

The debtors are prepared to borrow up to $150,000 for the upgrades and if possible, refinance the chicken house portion of Wells Fargo's indebtedness and/or the house and land

4 - U.S. Bankruptcy Court, M.D. Tenn.

portion of Wells Fargo's indebtedness. Under the debtors' amended plan, the amount owed to Wells Fargo on the house and land will be significantly reduced by this time, and the debtors assert that they will have sufficient equity upon which to borrow for the improvements and possibly refinance Wells Fargo's entire indebtedness. However, even if the debtors are unable to refinance any portion of Wells Fargo's indebtedness, the debtors' amended plan provides that the poultry operation portion will be paid off at the end of 20 years and the house and land will be paid off at the end of 30 years.

## II.  PROCEDURAL BACKGROUND

The debtors filed their voluntary Chapter 12 petition on October 15, 2008, and the debtors filed their initial Chapter 12 plan on March 19, 2009. As a preliminary matter, the Court held a hearing on Wells Fargo's motion to compel the debtors to assume or reject its lease. At that hearing, the Court ruled orally that Wells Fargo's interest was a security interest rather than a lease, and therefore, there was nothing to assume or reject. The order was entered on July 2, 2010. The first confirmation hearing was held on February 23, 2010, after the hearing on Wells Fargo's motion to compel but before entry of the order. At the end of the confirmation hearing, the parties were given an opportunity to submit proposed findings of fact and conclusions of law. Wells Fargo filed an expedited motion to extend the proof, which was heard on March 9, 2010. At the hearing, both parties stated they wanted to reopen the proof for more discovery. The Court granted their requests.

On June 23, 2010, the Court entered an agreed order allowing the debtors to assume a contract with Equity Group to resume receiving flocks. As part of this agreement with Equity Group, the debtors were required to: (1) fix or replace all fans, motors, gears, and water lines; (2) construct a litter storage box; and (3) add a composter.

The debtors filed motions to utilize funds and to incur credit in order to build the litter shed now required by Equity Group. At a hearing on these matters, the Court determined that these additional motions were contingent upon confirmation of an amended plan. The Court continued these two motions and set the hearing on confirmation of the debtors' amended plan, which was filed on September 28, 2010. The following conditions for approval of the motion to utilize funds and incur credit were set by the Court: (1) confirmation of an amended plan, (2) approval of the security instrument, a copy of which was to be filed on or before September 13, 2010, and (3) approval of the note, with the inclusion of a provision making it renewable for 30 years along with the amount of annual payments, a copy of which was to be filed on or before September 13, 2010. Findings of fact and conclusions of law were filed by both parties on September 28, 2010, and Wells Fargo filed supplemental findings on September 30, 2010. The confirmation hearing on the amended plan was held on December 9, 2010. Wells Fargo is the only party objecting to confirmation of the amended plan. The Chapter 12 Trustee does not object to confirmation or to the motions to utilize funds and incur credit.

6 - U.S. Bankruptcy Court, M.D. Tenn.

# III. **DISCUSSION**

## A. **STANDING**

The debtors assert that Wells Fargo does not have standing to object to confirmation because it failed to file a proof of claim in this case. The Court disagrees.

Pursuant to 11 U.S.C. § 1224, a "party in interest" may object to the confirmation of a plan. The question before this Court is whether Wells Fargo's lien makes it a "party in interest" and therefore, Wells Fargo has the right to object to its treatment under the plan.

First, the Court notes that a secured creditor is not required to file a proof of claim to maintain its interest in the collateral to which its security interest attaches. *See* 11 U.S.C. § 506(d)(2); *Talbert v. City Mortg. Servs. (In re Talbert),* 344 F.3d 555, 561 (6th Cir. 2003) ("real property liens emerge from bankruptcy unaffected"). There are two exceptions to this rule. First, if the secured creditor's lien exceeds the value of the collateral, the creditor must file a proof of claim on the deficiency in order to receive distribution for the unsecured portion of its claim. *PCFS Fin. v. Spragin (In re Nowak)*, 586 F.3d 450, 455-56 (6th Cir. 2009) (citing 11 U.S.C. § 506(a)(1); Fed. R. Bankr. P. 3002(a)). The second exception is where the creditor's lien is successfully avoided in an adversary proceeding pursuant to 11 U.S.C. § 544(a). *Id.* at 456. These exceptions do not apply here.

7 - U.S. Bankruptcy Court, M.D. Tenn.

Accordingly, Wells Fargo's lien against the collateral will survive bankruptcy, and the Court holds that Wells Fargo is a "party-in-interest" and has standing to object to the debtors' amended plan which purports to cramdown Wells Fargo's lien. *See In re Kressler,* 252 B.R. 632, 633-34 (Bankr. E.D. Pa. 2000) (citations omitted).

## B. CONFIRMATION

Chapter 12, which is modeled after Chapter 13, was enacted "in response to the agricultural debt crisis of the mid-1980s," *Traders State Bank of Poplar v. Mann Farms, Inc. (In re Mann Farms, Inc.),* 917 F.2d 1210, 1214 (9th Cir. 1990), and "was intended to enable family farmers to retain their farms while reorganizing their financial affairs." *In re Lockard,* 234 B.R. 484, 490 (Bankr. W.D. Mo. 1999).

Confirmation of a Chapter 12 plan is governed by 11 U.S.C. § 1225(a), which provides in relevant part:

(a) Except as [otherwise] provided . . ., the court shall confirm a plan if-

(1) the plan complies with the provisions of this chapter and with the other applicable provisions of this title;

* * * *

(3) the plan has been proposed in good faith and not by any means forbidden by law;

* * * *

8 - U.S. Bankruptcy Court, M.D. Tenn.

(5) with respect to each allowed secured claim provided for by the plan-

* * * *

       (B)(i) the plan provides that the holder of such claim retain the lien securing such claim; and

       (ii) the value, as of the effective date of the plan, of property to be distributed by the trustee or the debtor under the plan on account of such claim is not less than the allowed amount of such claim;

* * * *

(6) the debtor will be able to make all payments under the plan and to comply with the plan.

If a party in interest does not agree with its treatment in a proposed Chapter 12 plan, it may object. *See* 11 U.S.C. § 1224.

## 1. CRAMDOWN - 11 U.S.C. § 1225(a)(5)

Pursuant to 11 U.S.C. § 1225(a)(5)(B)(ii), the rights of an unconsenting secured creditor can be modified only if the creditor retains its lien on the security and receives collateral with a present value not less than the amount of the secured claim. To determine whether Wells Fargo is receiving present value, the Court must decide the value of the collateral and the interest rate to be applied under the amended plan.

9 - U.S. Bankruptcy Court, M.D. Tenn.

### a.  VALUATION OF COLLATERAL

Wells Fargo concedes that the debtors are entitled to cramdown the value of its secured claim to the value of the real estate.  The debtors and Wells Fargo each presented witnesses who qualified as experts as a result of their knowledge, skill, experience, and education under ***Daubert v. Merrell Dow Pharm., Inc.,*** 509 U.S. 579, 588 (1993) and Fed. R. Evid. 702.  ***See also Kumho Tire Co., Ltd. v. Carmichael***, 526 U.S. 137, 149 (1999) (concluding that ***Daubert*** applies to all expert matters described in Fed. R. Evid. 702).  Both experts based their opinions upon the application of three generally accepted methodologies: (1) Cost Approach, (2) Sales Comparison Approach, and (3) Income Approach.  The debtors' expert witness, Mr. Mainord, appraised the property at $700,000.  Wells Fargo's expert witness, Mr. Stringfellow, appraised the property at $945,000.


When considering expert testimony, the Court acts as a gatekeeper.  ***Kumho***, 526 U.S. at 149. The Court has a duty beyond passing on an expert's qualifications to determine the relevance or fit of those opinions to the facts of the case and to question the reliability of an expert's opinion, including not only the expert's methodology, but also his reasoning and source of data and facts.  Stan Bernstein et al., ***Squaring Bankruptcy Valuation Practice with Daubert Demands***, 16 Am. Bankr. Inst. L. Rev. 161, 168 (2007).  ***See also Tamraz v. Lincoln Elec. Co.,*** 620 F.3d 665, 668 (6th Cir. 2010) (citation omitted).

Here, the parties agree that both appraisers came to similar values under the Cost Approach and the Sales Comparison Approach. Mr. Mainord arrived at a Cost Approach value of $915,000 and a Sales Comparison Approach value of $870,000. Mr. Stringfellow arrived at a Cost Approach value of $1,000,000 and a Sales Comparison Approach value of $995,000. Despite the parties' agreement regarding these approaches, the Court has reviewed the differences in considering the reliability of each expert's testimony.

Under the Sales Comparison Approach, both experts' analysis used the same comparables, however, only one of the experts, Mr. Mainord, took into account the clear downward turn in the economy which has dampened sales across the state. Mr. Stringfellow's failure to take the downturn into account negatively affected both his reasoning and his data and resulted in an inflated number. Indeed, Mr. Stringfellow's number is higher than any of the comparable sales of improved land used by both experts. Mr. Stringfellow's number may also be inflated because he opined without any real foundation that this very rural property in a very impoverished part of the state (as Mr. Mainord testified) could be subdivided to get a higher price. The Court, in fulfilling its gatekeeper obligations, is not totally rejecting Mr. Stringfellow's analysis, but finds it registers significantly lower than Mr. Mainord's on the reliability scale.

The appraisers' opinions differed widely in their values under the Income Approach analysis: Mr. Mainord's appraised value under this approach was $580,000;

11 - U.S. Bankruptcy Court, M.D. Tenn.

Mr. Stringfellow's appraised value was $990,000. After reviewing the testimony and reports, the Court finds that Mr. Mainord's testimony under this approach is more reliable. After both appraisers agreed that the highest and best use of the property is as a poultry farm, Mr. Stringfellow added in the value of the house and land per acre because he felt the house could somehow be rented and the acreage used. Mr. Mainord testified that the house and property could only be added to the extent of the income generated, that the land was only good for hay production which brings little income in this area, that it was typical in this area for farmers to live on the property, and that the farmer has to live somewhere. Moreover, Mr. Hudson testified that poultry production requires constant monitoring. These circumstances make Mr. Stringfellow's Income Approach analysis appear hypothetical rather than grounded in fact or relevant data.

In addition, the Court finds that the sources of data used by Mr. Stringfellow were not as reliable. Mr. Mainord used available data from the debtors' financial records, USDA data from growers in *this* geographic area, and the potential earning capacity of similar properties in Macon County, Tennessee, where this chicken farm is located. Rather than just using local data, Mr. Stringfellow looked to data from Oklahoma, Arkansas, Texas, Mississippi, Alabama, and Georgia. Mr. Stringfellow's expense data also did not factor in yearly water expenses ($13,000) nor yearly bedding expenses ($6,600) – evidently not required by Arkansas integrators with whom he was more familiar. Mr. Stringfellow also did not take into account the debtors' actual expenses, and he refused to look at the debtors' financial

12 - U.S. Bankruptcy Court, M.D. Tenn.

papers. In short, Mr. Stringfellow's Income Approach analysis lacks the reliability of Mr. Mainord's analysis.

Finally, Mr. Mainord's reconciliation of the three approaches is more in line with the Uniform Standards of Professional Appraisal Practice (hereinafter "USPAP") guidelines. He explained that the values under the three approaches are significantly different when market conditions are other than ideal due to "a lack of market activity, changes in economic conditions in the market area, changes in lease/rental rates, and a[] number of other influences to value." Rather than manipulate the values under one approach to eliminate the large differences between the three, as did Mr. Stringfellow, Mr. Mainord recognized that the Income Approach more accurately reflected the market conditions and assigned it more weight in reaching his final valuation.

The Court finds that the value of the property is $700,000 (and thus, the value of Wells Fargo's security interest) as set forth in Mr. Mainord's testimony and report and in the debtors' amended plan.

### b. **INTEREST RATE**

The debtors' amended plan provides for 5% interest on Wells Fargo's liens. Wells Fargo objects to this interest rate, asserting that it is entitled to at least 7% interest based on the debtors' recent loan documents demonstrating that a lender is willing to write a loan for

the construction of a new litter shed at 7% interest until September 30, 2015, and thereafter a rate of prime plus 3.75%.

In ***Till v. SCS Credit Corp.,*** 541 U.S. 465 (2004), the Supreme Court adopted the "formula" or "risk plus" analysis in determining the appropriate rate of interest. Under this formula, the prime rate serves as a base rate and is adjusted for the risk of default associated with payments over the term of plan. The Supreme Court considered four risk factors, including: "(1) the probability of plan failure; (2) the rate of collateral depreciation; (3) the liquidity of the collateral market; and (4) the administrative expenses of enforcement." ***Id.*** at 484 (citation omitted). The Supreme Court placed the burden on the more knowledgeable creditors to present evidence to support a higher rate than the prime rate. ***Id.*** at 484-85. Under ***Till,*** the parties' original contract rate of interest is irrelevant. ***In re Riley,*** 428 B.R. 757, 765 (Bankr. N.D. Ohio 2010) (citing ***Till v. SCS Credit Corp.***).

On December 9, 2010, the date of the confirmation hearing, the prime rate was 3.25%. ***See*** http://www.federalreserve.gov/releases/h15/20101213/. The debtors' amended plan provides for an additional 1.75% to the prime rate, and Wells Fargo did not present any proof of risk factors that would support a higher rate. In ***Till,*** the Supreme Court did not endorse a range for the risk factors, but it noted that "other courts have generally approved adjustments of 1% to 3%." 541 U.S. at 480 (citation omitted). ***See also In re Soards,*** 344

14 - U.S. Bankruptcy Court, M.D. Tenn.

B.R. 829, 832 (Bankr. W.D. Ky. 2006) ("[i]n the absence of evidence of the risks associated with a default, the Court determines that an additional two percentage points to the prime rate is the appropriate rate to be applied"). Wells Fargo failed to show that a higher rate is supported, and the debtors' proposed interest rate is well within the generally approved increase over prime rate.

### c. CRAMDOWN IS PERMISSIBLE

The Court finds that the debtors have properly valued Wells Fargo's collateral at $700,000 and that the interest rate of 5% is the appropriate interest rate to be applied. Thus, the standards for cramdown have been met.

### 2. FEASIBILITY - 11 U.S.C. § 1225(a)(6)

Wells Fargo asserts that debtors' amended plan is not feasible because the debtors have not provided for a sufficient amount of funds needed to upgrade the broiler houses in 12 to 15 years. Wells Fargo points out that the debtors' expert, Mike Long, testified in his deposition that upgrades would cost $200,000, but the debtors' amended plan only budgets $150,000 for future upgrades. Finally, Wells Fargo argues that even if the Court accepts the debtors' budgeted upgrades, the amended plan is still not feasible because the debtors have only offered speculation as to their ability to obtain sums sufficient to pay the additional costs.

A Chapter 12 plan cannot be confirmed unless it is feasible. 11 U.S.C. § 1225(a)(6). "Feasibility is fundamentally a factual question since it necessarily depends upon a determination of the reasonable probability of payment." *In re Howard*, 212 B.R. 864, 878 (Bankr. E.D. Tenn. 1997) (citation omitted). In determining whether a plan is feasible, the Court must consider the proposed plan payments in the context of the projected income and expenses to determine whether the debtors are likely to be able to make all proposed payments required under their amended plan. *In re Elk Creek Salers, Ltd.*, 286 B.R. 387, 396 (Bankr. W.D. Mo. 2002) (citation omitted).

The plan must be realistic, and the debtors bear the burden of proving that they will be able to perform what they are proposing under the plan. *In re Howard*, 212 B.R. at 880 (citation omitted). When deciding whether the debtors have met this burden, the Court must take into account that "the purpose of Chapter 12 is to promote the reorganization attempts of family farmers," and that "courts generally give debtors the benefit of the doubt on the issue of feasibility, provided a reasonable probability of success is established." *In re Lockard*, 234 B.R. 484, 492 (citation omitted). The debtors do not have to guarantee success, but they must "provide a reasonable assurance that the plan can be effectuated, and that reasonable assurance must rise above 'bare agronomic feasibility.'" *In re Wilson*, 378 B.R. 862, 891 (Bankr. D. Mont. 2007) (citation omitted). "Sincerity, honesty and willingness are not sufficient to make the plan feasible, and neither are any visionary

promises. The test is whether the things which are to be done after confirmation can be done as a practical matter under the facts." *In re Lockard*, 234 B.R. at 492 (citation omitted); *see also In re Howard*, 212 B.R. at 879 (feasibility "must be based on objective facts rather than wishful thinking") (citation omitted).

The debtors' amended plan explains the financial problems that led to the debtors seeking bankruptcy protection. The amended plan sets out in detail how the debtors will meet the expenses of the poultry operation. The only unknown is whether the debtors will be able to obtain financing that will be necessary at the end of 12 to 15 years for upgrades. In Chapter 12, it is not uncommon for there to be future balloon payments or refinancing as part of a plan. In such cases, courts look at the "probability of successfully refinancing, particularly by evaluating the existing equity in the property and projected equity at the time of refinancing." *In re Field*, No. 04-00028-TLM, 2005 WL 3148287, at *8 (Bankr. D. Idaho Oct. 17, 2005) (citations omitted). The debtors obviously cannot guarantee that they will be able to obtain the financing needed for the improvements 12 to 15 years down the road. However, the debtors have shown that they will have significantly reduced the principal owed to Wells Fargo on both the house and land and the poultry operation. Specifically, the amended plan projects:

| Year | Personal | Poultry | Total |
|---|---|---|---|
| 8 | $163,411.99 | $363,512.69 | $526,924.68 |
| 10 | $154,825.93 | $316,945.35 | $471,771.28 |
| 12 | $145,338.86 | $265,506.03 | $410,844.89 |
| 15 | $129,209.26 | $178,082.68 | $307,291.68 |

Based on these numbers, the Court finds that the debtors will have sufficient equity in the property from which to finance the necessary upgrades, and hopefully be able to refinance the entire debt owed to Wells Fargo. The debtors also have shown that they have access to other lenders, specifically Citizens Bank. Even if the debtors are not able to refinance the debt, Wells Fargo's lien on the poultry operation will be paid in 20 years.

Certainly the debtors' cannot guarantee success, but the Court finds that the debtors should be given an opportunity to reorganize, especially in light of this projected reduction in Wells Fargo's principal, the financing for the litter shed they are now able to obtain (see below), and the mandate to help family farmers through Chapter 12 reorganization. *See In re Wilson,* 378 B.R. 862, 882 (citation omitted).

The Court finds that Wells Fargo's objections to the debtors' Chapter 12 amended plan should be overruled and that the debtors' amended plan meets all the requirements of

11 U.S.C. § 1225.  Having found that the amended plan can be confirmed, the Court will now consider the additional motions filed by the debtors.

## C.  <u>MOTION TO UTILIZE FUNDS</u>

The debtors requested permission to utilize $15,000 held by the Chapter 12 Trustee, as working capital, to resume their poultry operation and to overhaul the water purification system.  The debtors' amended plan recognizes startup costs necessary for placement of flocks from Equity Group, and this motion proposes that funds held by the Chapter 12 Trustee be utilized for this purpose.  The debtors have shown that these funds are necessary to cover the initial operating expenses associated with maintenance of the flocks and to repair and overhaul the water purification system, which purifies the water used for the flocks.

## D.  <u>MOTION TO INCUR CREDIT</u>

In addition, the debtors seeks authority to incur post-petition financing for the purpose of constructing a litter shed, which Equity Group requires before delivering flocks. Betty Sue Hibdon, the President and CEO of Citizens Bank, testified that Citizens Bank is willing to loan the debtors money for the construction of the new litter box.  The promissory note is in the amount of $27,500 with monthly payments of $184.86.  The initial maturity date is September 30, 2015, but "[t]his note will be renewed up to 30 years until the principal amount of the note is satisfied."  The financing requires that Citizens Bank have a

19 - U.S. Bankruptcy Court, M.D. Tenn.

superpriority lien on the property. Wells Fargo objects, asserting that its lien will not be adequately protected.

Section 364(d)(1) provides that the bankruptcy court may authorize post-petition financing supported by a superpriority lien only if "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted" and that the debtor "is unable to obtain such credit otherwise." The debtor has the burden to establish that the holder of the lien to be subordinated has adequate protection. *See* 11 U.S.C. § 364(d)(2). In Chapter 12, when adequate protection is required under 11 U.S.C. § 364, such adequate protection may be provided by:

> 1) requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of property securing a claim or of an entity's ownership interest in property;
>
> (2) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of property securing a claim or of an entity's ownership interest in property;
>
> (3) paying to such entity for the use of farmland the reasonable rent customary in the community where the property is located, based upon the rental value, net income, and earning capacity of the property; or

(4) granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will adequately protect the value of property securing a claim or of such entity's ownership interest in property.

11 U.S.C. § 1205(b).


"Adequate protection is designed to preserve the secured creditor's position at the time of the bankruptcy." *See Coble Sys., Inc. v. Coors of the Cumberland, Inc. (In re Coors of the Cumberland, Inc.),* 19 B.R. 313, 321 (Bankr. M.D. Tenn. 1982) (citation omitted). Although the concept of adequate protection is intended to protect a creditor's interest in the collateral, it is susceptible to differing applications over a wide range of factual situations.


Based on the debtors' agreement with Equity Group, they must build a new litter shed or Equity Group will not supply flocks. In turn, without flocks, the poultry operation will cease and there will be no way for the debtors to make payments on Wells Fargo's lien. Moreover, both appraisers testified and reported that the poultry operation was the best use of this farm under their Income Approach valuations. The construction of the litter shed will improve the poultry operation and will add value to Wells Fargo's security (farm and broiler houses). The Court finds that this is sufficient to provide adequate protection to Wells Fargo.

## IV.  <u>CONCLUSION</u>

Based on the discussion above, the Court finds that the debtors' amended plan should be confirmed and their motions to utilize funds and incur credit should be granted.

An appropriate order will enter.

**This Memorandum Opinion was signed and entered electronically as indicated at the top of the first page**

This Order has Been electronically
signed.  The Judge's signature and
Court's seal appear at the top of the
first page.
United States Bankruptcy Court.